## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RUTH FALKENBERG,         )  Case No.:
c/o Motley Rice LLC        )
28 Bridgeside Boulevard    )  COMPLAINT
P.O. Box 1792            )
Mt. Pleasant, SC 29465,    )

       Plaintiff,        )

    vs.                 )

CARLA J. MARTIN, Individually,
4000 Tunlaw Rd NW
Apt. 710
Washington, DC 20007

       Defendant

---

## COMPLAINT

Comes now Plaintiff, Ruth Falkenberg, and brings this *Bivens* action against Defendant, Carla J. Martin.

## JURISDICTION

1.    This is a civil action brought pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388 (1971). The Court has jurisdiction over this action pursuant to 28 U.S.C.§§ 1331 and 2201 because it is a federal question and pursuant to 28 U.S.C. § 1331 the district courts shall have original jurisdiction of all civil actions arising under the Constitution.

## VENUE

2.      Venue is appropriate in this judicial district pursuant to 28 U.S.C. 1332.  A substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

3.      Plaintiff is an individual suing in her individual capacity and Defendant is an individual being sued in her individual capacity, and neither are corporate entities.

4.      Carla J. Martin, at all times relevant herein is a resident of the District of Columbia.

5.      Carla J. Martin, at all times relevant herein was an employee of the United States of America.

## FACTS

6.      From on or about 1989 until on or about 2002, Carla J. Martin was employed by the U.S. Department of Transportation in a position assigned to the Federal Aviation Administration (DOT-FAA), an agency of the United States government.

7.      The DOT is located at 400 7th Street, S.W. Washington, D.C.  The FAA is located at 800 Independence Avenue, S.W. Washington, D.C.

8.      From on or about 2002, until the present Carla J. Martin was employed by the U.S. Department of Homeland Security assigned to the Transportation Security Administration (DHS-TSA), an agency of the United States government.

9.      The DHS lists its address on the DHS website at www.dhs.gov/ahspublic/contacts as Washington, D.C.  The TSA is located at 601 South 12th Street, Arlington, Virginia.

10.    At all times relevant herein, Carla J. Martin held herself forth as acting under color of her federal authority as an employee and/or agent of the United States government.

11.    At no time relevant herein was Carla J. Martin a U.S. Attorney, an Assistant U.S. Attorney, a federal or state judge, a federal law enforcement officer, a member of Congress, a state legislator, or the President of the United States.

12.    Carla J. Martin is not immune from civil lawsuits.

13.    This cause of action, which is commonly known as a *Bivens* action, seeks to recover damages from Carla J. Martin, individually, for constitutional violations she committed against the Plaintiff, and the damages caused by defendants actions, such action was affirmed in Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed. 2d 619(1971).

14.    Plaintiff has no other remedy for the unconstitutional violation of her rights by federal employee Carla J. Martin, and the damages she has suffered due to such acts.

15.    Plaintiff is not an employee of any government agency and thus the cause of action herein does not arise from any federal employment by plaintiff nor are there any other such special factors herein.

16.    The design of the relevant federal programs and/or federal agencies herein -- to wit, the DOT-FAA and the DHS-TSA -- are such that Congress has not provided adequate alternative remedial mechanisms, and it has not explicitly declared any substitute remedy, if any, as a substitute for recovery directly under the Constitution. Any such remedy, if any, is not as equally effective as this *Bivens* action for the constitutional violations herein.

17.     Plaintiff in this action is not claiming an injury resulted from agency action or agency decision, nor is plaintiff claiming herein that defendant violated her Constitutional rights while implementing agency action.

18.     Plaintiff is claiming herein that Carla J. Martin's intentional acts were separate and apart from any agency decision, and violated her Constitutional rights.

19.     Carla J. Martin's acts also were criminal conduct in violation of clearly established law and/or court orders.

20.     Carla J. Martin's actions to conspire or collude to destroy or cover up evidence render plaintiff's judicial remedies inadequate and ineffective and violate plaintiff's right of access to justice.

21.     Carla J. Martin acted contrary to clearly established Constitutional norms that a reasonable official would understand.

22.     On September 11, 2001, plaintiff herein lost a family member on an aircraft operated by American Airlines (AA) as Flight 77. Thereafter, and at all times relevant herein, plaintiff brought an individual suit against AA and others to redress the loss of life and other damages stemming from the death of her sister-in-law on 9/11.

23.     Plaintiff herein is the lawfully appointed personal representative appointed by an appropriate court to seek legal redress and maintain legal action(s) concerning the wrongful death of her sister-in-law.

24.     Plaintiff's underlying claims are embodied in a federal legal action pending in the United States District Court for the Southern District of New York, and captioned:


**RUTH FALKENBERG, as Personal Representative**

**of the Estate of LESLIE WHITTINGTON, Deceased**

Plaintiffs,                          **CASE #02 CV 7145**

vs.

AMERICAN AIRLINES, INC.,

A Delaware Corporation, et al.,

Defendants.

25.    Plaintiff's underlying claim is attached hereto as Exhibit A and incorporated by reference as though fully set forth herein, and as such is described in this Complaint as though it were being independently pursued herein. However, plaintiff's wrongful death action is, and remains, a separate cause of action in another court.

26.    The underlying cause of action is only an element in this complaint, and it is not identical to, nor sought to be litigated in, this action.  The remedies sought by plaintiff herein are different from, and not available in, the underlying litigation.


**CAUSE OF ACTION FOR DAMAGES AND DECLATORY RELIEF**

27.    After commencing the underlying wrongful death cause of action, plaintiff, through her counsel, both through independent investigation and through formal discovery, sought evidence relevant to the case and sought to lawfully prosecute her case and claims in the courts of the United States.

28.    Evidence both obtained and sought in the underlying case concerns the conduct of airlines of U.S. registry including American Airlines (AA) and United Airlines (UAL) and others, and their performance of aviation security activities.

29.    These airlines were on 9/11/01, and at all times relevant herein, subject to Federal Aviation Regulations enforced by the DOT-FAA, and after it was established after 9/11/01, subject to regulations of the DHS-TSA.

30.     Defendant engaged in the following activities, which actions, and each of them, violated defendant's Constitutional rights by frustrating the underlying wrongful death litigation and harming or depriving plaintiff of her right to a full and/or fair trial:

   a. Carla J. Martin interfered with and deprived plaintiff of evidence in support of herunderlying wrongful death case;

   b. Carla J. Martin interfered in the administration and progress of the civil case;

   c. Carla J. Martin destroyed, tampered with, hid, tainted, obfuscated, made unavailable, removed, reshaped or sought to influence evidence in the case and testimony of potential witnesses;

   d. Carla J. Martin colluded and/or conspired with known and unknown representatives of airlines which are defendants in the underlying wrongful death case to hide, obfuscate, make unavailable, remove, abscond with, destroy, change or otherwise tamper with evidence and potential witnesses;

   e. Carla J. Martin deprived plaintiff or caused plaintiff to be deprived of evidence independently obtained by her counsel;

   f. Carla J. Martin sought to prevent plaintiff from engaging in discovery in her underlying civil case;

   g. Carla J. Martin interfered with plaintiff's rights to trial, and to her rights to seek redress in court;

   h. Carla J. Martin illegally tampered with witnesses and evidence in the case of <u>United States vs. Moussaoui</u> which evidence was also sought in plaintiff's underlying wrongful death case and undertook such actions in

an effort to assist the defendants in plaintiff's underlying wrongful death case;

i.   Carla J. Martin sought and/or enlisted the assistance of others to cause the denial of plaintiff to have access to evidence in her underlying case, including seizing, hiding, removing, sequestrating, labeling as Sensitive Security Information, and otherwise causing the unavailability of information which was previously public;

j.   Carla J. Martin coordinated, conspired, colluded, aided and abetted or otherwise acted in conduct with certain known and unknown airline representatives, which airlines are defendants in plaintiff's underlying suit, and which representatives are involved in the underlying litigation, all to deprive plaintiff of her Constitutional rights to a fair trial;

k.   Carla J. Martin violated court orders;

l.   Carla J. Martin illegally coached witnesses, and otherwise attempted to shade and alter evidence before the <u>Moussaoui</u> court, with the intent of helping defendants in plaintiff's underlying lawsuit in the Southern District of New York; and/or

m.  Carla J. Martin ordered the destruction of documents and other evidence.

n.   Carla J. Martin undertook these and/or other such actions which violate plaintiff's Constitutional rights.

31.    Defendant's actions are outside the scope of her official responsibilities as an employee of the United States.

32.    The United States District Court for the Northern District of Virginia determined that Defendant's actions were improper, unauthorized and not capable of

being authorized by her position in the government, and in violation of the Court's orders entered in the case U.S.A. v. Zacarias Moussaoui.

33.    Defendant's acts were for the purpose of assisting persons she has identified in documents as her "friends", including attorneys and/or other representatives acting on behalf of various U.S. airlines, defendants in the plaintiff's underlying lawsuit. Defendant sought to manipulate the evidence and testimony in the Zacarias Moussaoui case to assist her "friends" in defending against this plaintiff's and other plaintiffs', wrongful death suit against the airlines represented by her "friends" and others. Defendant also sought to manipulate the evidence and testimony and damage or destroy plaintiff's right to a fair trial in her underlying litigation in the United States District Court for the Southern District of New York. Defendant did and/or attempted to interfere with, destroy, inhibit, obfuscate, or otherwise make it impossible for plaintiff to obtain evidence and witnesses in her civil action against the carriers including those represented by her "friends" which defendant attempted to assist through her actions.

34.    Plaintiff was harmed by and suffered damages because of defendant's acts and/or omissions.

35.    Plaintiff herein does not otherwise have an adequate remedy at law other than this *Bivens* action. The court in the underlying case, the United States District Court in the Southern District of New York, has already ruled that the defendant's actions at issue in this *Bivens* claim are beyond the scope of its powers, and it is without power or jurisdiction to address the illegal actions of Defendant, Carla J. Martin. The Southern District of New York's order is attached hereto as Exhibit B and incorporated as though fully set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek damages from Defendant, Carla J. Martin, individually, as follows:

a.) damages in an amount deemed by this honorable court to be fair and just,

b.) punitive or exemplary damages as allowed by law,

c.) attorneys fees and costs as allowed by law,

d.) declaratory relief including temporary and permanent injunctive relief commanding defendant Martin to cease and desist her illegal activities; to be barred from actions in regard to 9/11 cases; to be enjoined from further tampering, destruction, obfuscation, removal, hiding or otherwise tainting of evidence or witnesses.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Respectfully Submitted,

Mary Schiavo
DC Bar No. 440175
Motley Rice LLC
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465
(843) 216-9000

# EXHIBIT A

**HANLY & CONROY LLP**
**Attorneys for Plaintiffs**
**415 Madison Avenue**
**New York, New York 10017**
**(212) 401-7600**
**Paul J. Hanly, Jr. (PH-5486)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| RUTH FALKENBERG, as Personal Representative ) of the Estate of LESLIE WHITTINGTON, Deceased, ) | |
| ) | |
| Plaintiffs, ) | Case #02-CV-7145 |
| ) | |
| vs. ) | |
| ) | |
| AMERICAN AIRLINES, INC., ) A Delaware Corporation, ) | **THIRD AMENDED COMPLAINT** |
| ) | |
| AMR Corporation, ) A Delaware Corporation, ) | Plaintiffs Demand a Jury Trial |
| ) | |
| AIRTRAN AIRWAYS, INC., ) A Delaware Corporation, ) | |
| ) | |
| ATLANTIC COAST AIRLINES, INC., ) A California Corporation, ) | |
| ) | |
| CONTINENTAL AIRLINES, INC., ) A Delaware Corporation, ) | |
| ) | |
| DELTA AIR LINES, INC., ) A Delaware Corporation, ) | |
| ) | |
| NATIONAL AIRLINES, INC., ) A Delaware Corporation, ) | |
| ) | |
| NORTHWEST AIRLINES CORPORATION, ) A Delaware Corporation, ) | |
| ) | |
| UNITED AIR LINES, INC. ) A Delaware Corporation, ) | |

U.S. AIRWAYS, INC.,                              )
A Delaware Corporation,                          )
                                                 )
ARGENBRIGHT SECURITY, INC.,                      )
A Georgia Corporation,                           )
                                                 )
SECURICOR, PLC,                                  )
A United Kingdom business entity of unknown      )
Form,                                            )
                                                 )
METROPOLITAN WASHINGTON                          )
AIRPORTS AUTHORITY,                              )
A Government Entity,                             )
                                                 )
THE BOEING COMPANY,                              )
A Delaware Corporation,                          )
                                                 )
                        Defendants.              )
_____          )

Plaintiff, Ruth Falkenberg, as Personal Representative of the Estate of Leslie Whittington, Deceased, complaining of the Defendants herein, upon information and belief, allege as follows:

## NATURE OF THE CAUSE OF ACTION

1.      This is an action for damages for personal injuries as a result of the hijacking of American Airlines Flight 77 and its crash into the Pentagon on September 11, 2001. This action is brought against Defendants for their negligent and reckless failure to provide, develop and/or implement basic safety, security and design measures prior to September 11, 2001. Defendants' negligent and reckless disregard for the public safety of the civil aviation system enabled five middle-eastern Islamic terrorist hijackers to board American Airlines Flight 77 on September 11, 2001, with dangerous weapons, to terrorize passengers and crew, and to hijack the aircraft. These extremist Islamic al Qaeda terrorists then deliberately crashed American Airlines Flight 77

into the Pentagon, causing the personal injuries and death of Leslie Whittington at the Pentagon, and the subsequent loss of service, companionship and consortium to Plaintiffs as a result of these injuries.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 408(b)(1)(3) of the Air Transportation Safety and Systems Stabilization Act ("ATSSSA"), Pub. L. No. 107-42, 115 Stat. 230242 (Sept, 22, 2001) (reprinted, as amended, at 49 U.S.C. § 40101 note (West 1993)).

3.     Jurisdiction as to American is based upon federal question, 28 U.S.C. § 1331, under a treaty of the United States, the Convention for the Unification of Certain Rules Relating to International Carriage by Air, Signed at Warsaw on 12 October 1929, (commonly known as the "Warsaw Convention") 49 Stat., Part II, P.3000, 2 Bevans 983, 137 L.N.T.S. 11, as modified by the 1996 IATA/Intercarrier Agreement which, among other things, eliminates any limitation on damages.

4.     This Court also has jurisdiction under 28 U.S.C. § 1332, in that the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and there is diversity of citizenship between the parties.  This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 for all related claims.  Finally, this Court also has personal jurisdiction over the Defendants herein.

5.     Venue is appropriate in this forum based on ATSSSA § 408(b)(1)(3).

**PARTIES**

**PLAINTIFFS**

6.     Plaintiff, Ruth Falkenberg, is the Personal Representative of Leslie Whittington, who was killed on American Airlines Flight 77 during its hijacking and eventual crash into the Pentagon. Leslie Whittington was a passenger on American Airlines Flight 77. Plaintiff Ruth Falkenberg is the Personal Representative of the Estate of Leslie Whittington. Plaintiffs brings on behalf of the Estate of Leslie Whittington. Plaintiff is a resident of the State of Colorado.

**DEFENDANTS**

**Airline Defendants**

7.     Defendant American Airlines, Inc. (hereinafter "American") is a Delaware corporation whose principal place of business is located at 4333 Amon Carter Boulevard, Fort Worth, Texas 76155. At all times pertinent to the Complaint, American was a common carrier which operated a commercial airline transporting passengers from the Washington Dulles International Airport. American was jointly, severally, and contractually responsible through its agents, employees and contractors for maintaining the security of aircraft operating out of the Washington Dulles International Airport.

8.     Defendant AMR Corporation (hereinafter "AMR") is a corporation organized and existing under the laws of Delaware and maintains its principal place of business in Texas.

9.     Defendant AMR is engaged in the business of air transportation of passengers for hire.

10.     Defendant AMR is the parent corporation of, and exercised control over, its wholly-owned subsidiary, defendant American.

4

11.    Defendant AMR, as the parent corporation of its wholly-owned subsidiary American, is liable for the negligent, reckless and wanton acts of American.  (AMR and American are collectively referred to as "American").

12.    Defendant AirTran Airways, Inc. (hereinafter "AirTran") is a Delaware corporation whose principal place of business is 9955 AirTran Boulevard, Orlando, Florida, 32827.  At all times pertinent to the Complaint, AirTran was a common carrier which operated a commercial airline transporting passengers from the Washington Dulles International Airport. AirTran was jointly, severally, and contractually responsible through its agents, employees and contractors for maintaining the security of aircraft operating out of the Washington Dulles International Airport.

13.    Defendant Atlantic Coast Airlines, Inc. (hereinafter "Atlantic Coast") is a California corporation whose principal place of business is located at 45200 Business Court, Dulles, Virginia 20166.  At all times pertinent to the Complaint, Atlantic Coast was a common carrier which operated a commercial airline transporting passengers from the Washington Dulles International Airport.  Atlantic Coast was jointly, severally, and contractually responsible through its agents, employees and contractors for maintaining the security of aircraft operating out of the Washington Dulles International Airport.

14.    Defendant Continental Airlines, Inc. (hereinafter "Continental") is a Delaware corporation whose principal place of business is located at 1600 Smith Street, 3303D, Dept. HQSEO, Houston, Texas 77002.  At all times pertinent to the Complaint, Continental was a common carrier which operated a commercial airline transporting passengers from the Washington Dulles International Airport.  Continental was jointly, severally, and contractually

responsible through its agents, employees and contractors for maintaining the security of aircraft operating out of the Washington Dulles International Airport.

15.    Defendant Delta Air Lines, Inc. (hereinafter "Delta") is a Delaware corporation whose principal place of business is located at P.O. Box 45852, Dept. 852, Atlanta, Georgia 30320. At all times pertinent to the Complaint, Delta was a common carrier which operated a commercial airline transporting passengers from the Washington Dulles International Airport. Delta was jointly, severally, and contractually responsible through its agents, employees and contractors for maintaining the security of aircraft operating out of the Washington Dulles International Airport.

16.    Defendant National Airlines, Inc. (hereinafter "National") is a Delaware corporation whose principal place of business is located at 6020 Spencer Street, Las Vegas, Nevada 89119-2934. At all times pertinent to the Complaint, National was a common carrier which operated a commercial airline transporting passengers from the Washington Dulles International Airport. National was jointly, severally, and contractually responsible through its agents, employees and contractors for maintaining the security of aircraft operating out of the Washington Dulles International Airport.

17.    Defendant Northwest Airlines Corporation (hereinafter "Northwest") is a Delaware corporation whose principal place of business is located at 5101 Northwest Drive, St. Paul, Minnesota 55111-3034. At all times pertinent to the Complaint, Northwest was a common carrier which operated a commercial airline transporting passengers from the Washington Dulles International Airport. Northwest was jointly, severally, and contractually responsible through its agents, employees and contractors for maintaining the security of aircraft operating out of the Washington Dulles International Airport.

18.    Defendant United Air Lines, Inc. (hereinafter "United") is a Delaware corporation whose principal place of business is located at 1200 East Algonquin Road, Elk Grove Township, Illinois 60007.  At all times pertinent to the Complaint, United was a common carrier which operated a commercial airline transporting passengers from the Washington Dulles International Airport.  United was jointly, severally, and contractually responsible through its agents, employees and contractors for maintaining the security of aircraft operating out of the Washington Dulles International Airport.

19.    Defendant U.S. Airways, Inc. (hereinafter "U.S. Airways") is a Delaware corporation whose principal place of business is 2345 Crystal Drive, Arlington, Virginia 22227. At all times pertinent to the Complaint, U.S. Airways was a common carrier which operated a commercial airline transporting passengers and crew members from the Washington Dulles International Airport.  U.S. Airways was jointly, severally, and contractually responsible through its agents, employees and contractors for maintaining the security of aircraft operating out of the Washington Dulles International Airport.

20.    The Defendants identified in this section are referred to herein as the "Airline Defendants."

### Security Company Defendants

21.    Defendant Argenbright Security, Inc. (hereinafter "Argenbright") is a Georgia corporation whose principal place of business is (or was) located at 3353 Peachtree Road NE, Suite 1120, Atlanta, Georgia 30326.  At all times pertinent to the Complaint, Argenbright was hired by the defendants herein to provide and maintain the security at Washington Dulles International Airport in Arlington, Virginia, among other locations.

22.    Defendant Securicor PLC (hereinafter "Securicor") is a foreign corporation organized and existing under the laws of the United Kingdom.    Securicor is the parent corporation of, and exercised control over, its wholly-owned subsidiary, defendant Argenbright. Securicor, as the parent corporation of its wholly-owned subsidiary Argenbright, is liable for the negligent, reckless and wanton acts of Argenbright.

23.    Argenbright and Securicor (hereinafter "the Security Company Defendants") were corporations engaged in the business of, and separately and collectively assumed responsibility for, implementing, developing, owning, operating, managing, maintaining and supervising airline and airport security for American for their flights departing from Washington Dulles International Airport, including Flight 77.

### Airport Defendant

24.    Defendant Metropolitan Washington Airports Authority (hereinafter "Airport Defendant") at all times pertinent, was and is a government entity duly organized and existing under the laws of Washington, DC and maintaining its principal place of business in Washington, DC.    On September 11, 2001,    Defendant Metropolitan Washington Airports Authority controlled, operated, managed, and maintained Dulles Airport and was responsible for airline and airport security for all flights departing from Dulles Airport and share responsibility for airport security at Dulles Airport.

### Aircraft Defendant

25.    Defendant Boeing Co. (hereinafter "Boeing") is a Delaware corporation whose principal place of business is located at 7755 East Marginal Way South, Seattle, Washington 98108.  Boeing is engaged in the business of designing and manufacturing aircraft to be used to

8

transport passengers and crew by commercial carriers in the United States and throughout the world.  Boeing designed and manufactured the Boeing 757-223, tail number N644AA, which operated on September 11, 2001, as American Airlines Flight 77.

### Aviation Industry

26.     The defendants herein are cumulatively referred to as the "aviation industry defendants" or the "aviation industry."

### FACTUAL ALLEGATIONS

27.     On September 11, 2001, Defendant American Airlines was a common carrier which operated the Boeing 757-223 aircraft, tail number N644AA, as American Flight 77, offering non-stop service between Washington Dulles International Airport and Los Angeles International Airport.  At all times pertinent to this Complaint, American owned, operated and supervised American Flight 77 through its agents, employees and contractors.

28.     On the morning of September 11, 2001, American Airlines Flight 77 (hereinafter "Flight 77") was scheduled to depart from Washington Dulles International Airport in Virginia and arrive at Los Angeles International Airport in California later that day.

29.     At all relevant times, defendant American, through its agents, servants, employees and/or representatives owned, operated, controlled, manned, supervised, monitored and directed the subject aircraft.  American, with the aviation industry defendants, jointly and severally shared responsibility for the boarding area and security system through which the terrorists passed, gained access to, and boarded the aircraft.

30.     At all relevant times, Defendants Argenbright and Securicor, through their agents, servants, employees and/or representatives owned, operated, manned, supervised, monitored and

directed the security and screening system at Washington Dulles International Airport, through which the terrorists passed, gained access to, and boarded the aircraft.

31.    In addition to American, at all relevant times, the Airline Defendants named herein, through their agents, servants, employees and/or representatives contracted for, owned, operated, manned, supervised, monitored and/or otherwise directed or controlled the security and screening system, through which the terrorists passed, gained access to and boarded the aircraft.

32.    The Airline Defendants jointly entered a contractual relationship with the Security Company Defendants to provide security screening services at Washington Dulles International Airport. Argenbright and Securicor served as the agent of the Airline Defendants and Airport Defendant.

33.    The aviation industry defendants, through Argenbright and others, jointly managed, supervised, and controlled the security screening system through which the terrorists and weapons were allowed to freely pass.

34.    At all relevant times, the Airport Defendant, through its agents, servants, employees and/or representatives, owned, operated, manned, supervised, monitored and directed the security and screening systems of Washington Dulles International Airport, through which the terrorists passed, gained access to, and boarded the aircraft. The Airport Defendant is a public body charged with duties related to the general public welfare, including the safety of the aviation system, and security of Washington Dulles International Airport.

35.    The aviation industry defendants' grossly and negligently inadequate security measures and deficient passenger screening system were insufficient to combat the risk of terrorist activity on domestic flights. The risk of hijacking and terrorism was well known by the

10

aviation industry defendants and should have been acted upon. The risk of a deadly terrorist attack was reasonably foreseeable and even was a risk insured against.

36.    The aviation industry has long been on notice of the threat of terrorism, and knew or should have known that enhanced safety measures could deter the threat or risk of violent and deadly terrorist hijacking. Yet, in the face of this recognized threat, the aviation industry did not implement basic safety measures necessary to protect the public.

37.    The aviation industry defendants knew or should have known that Argenbright failed to adequately train its employees, hired illegal aliens, failed to conduct required criminal background checks and routinely failed to perform adequately in undercover security evaluations.

38.    The conduct of the aviation industry defendants in their respective acts of commission and omission constituted a violation of the applicable state and federal rules, regulations and laws, including, but not limited to, the Air Transportation Security Act of 1974.

39.    On the morning of September 11, 2001, five terrorist hijackers, carrying dangerous and deadly weapons, passed through security screening checkpoints at Washington Dulles International Airport (or "Dulles Airport"). Prior to the departure of Flight 77, five al Qaeda terrorists (or "hijackers") succeeded in transporting deadly weapons through the passenger screening and security system, maintained by the Airline Defendants, the Dulles Airport and Argenbright, and onto the aircraft manufactured by Boeing. These young, middle-eastern, male terrorists were freely permitted access to and did board American Flight 77, transporting dangerous and deadly weapons.

40.    Upon information and belief, the five individuals who hijacked Flight 77 have been identified as Khalid Al-Midhar, Majed Moqed, Nawaq Alhamzi, Salem Alhamzi, and Hani

Hanjour (collectively referred to as the "hijackers") and were associated with or members of the Al Qaeda terror network led by Osama Bin Laden.

41.    Shortly after American Airlines Flight 77 departed from Dulles Airport at 8:10 a.m. on September 11, 2001, the hijackers seized control of the aircraft. The hijackers were able to gain access to and seize control of the aircraft as a direct and proximate result of the aviation industry's repeated failure to implement basic and fundamental safety features and security measures which would have prevented the hijackers from ever accomplishing their mission.

42.    Having studied the American aviation system and its weaknesses in the face of known threats, the terrorists stormed the aircraft's cockpit, overtaking the pilots and crew, terrorizing the passengers, and hijacking American Flight 77. The negligence of the Defendants put in place wholly inadequate safety measures which allowed the tragic events to occur that led to the crash of the airplane and thus to the injuries of Leslie Whittington. As a result of being allowed to freely board American Flight 77, the terrorist hijackers took and maintained control of the aircraft, causing American Flight 77 to deviate from its scheduled flight path and to intentionally crash into the Pentagon, a known national landmark and terrorist target.

43.    Prior to September 11, 2001, the Department of Transportation through its Federal Aviation Administration licensed American and the Other Airline Defendants as commercial air carriers authorized to transport passengers for hire, pursuant to which American and Other Airline Defendants had an obligation to comply with all federal statutes, rules, regulations, and environmental directives to achieve the highest level of airline and airport security to ensure that passengers and persons on the ground or in buildings who might suffer injury or death as a result of improper or unauthorized operation of an aircraft were protected from harm as a result of a terrorist action.

12

44.    On and prior to September 11, 2001, American, the Airline Defendants, and the Security Company Defendants, through their agents, servants, officers, employees, designees and/or contractors jointly and severally undertook and were required to develop, implement, own, operate, manage, supervise, staff, equip, maintain, control and/or oversee the airline and airport security system at Dulles Airport (including, but not limited to passenger screening, security checkpoint operations, pre-boarding passenger and luggage inspections, controlling access to secure areas and other security activities, ticketing purchase and check-in procedures and passenger identification and document checks for the subject aircraft and flight), to ensure the safety of persons traveling in air transportation and persons on the ground and in buildings who might suffer death or injury as a result of improper or unauthorized operation of an aircraft by persons engaged in acts of criminal violence, air piracy or terrorist activity.

45.    Prior to September 11, 2001, American and the Airline Defendants entered into contractual relationships with the Security Company Defendants to provide security screening services at Dulles Airport.

46.    On and prior to September 11, 2001, American, the Airline Defendants, and the Security Company Defendants, through their respective officers, agents, employees, servants and/or representatives, separately and collectively, selected, hired, trained, instructed and supervised the security checkpoint screeners, metal detector and x-ray machine monitors and others who operated, maintained and controlled the security checkpoints at Dulles Airport.

47.    Prior to September 11, 2001, regular meetings were held among American, the Other Airline Defendants, the Security Company Defendants, and ATA during which airport security was discussed, and details about terrorist threats and potential security breaches were reviewed and discussed.

48.    On and prior to September 11, 2001, all Defendants, their agents, associates, and partners, and each of them, were the agent, servant, employee, assignee, successor in interest, or joint venture of each other and were acting within the purpose or scope of such agency or employment; and all acts or omissions alleged herein of each defendant were authorized, adopted, approved, or ratified by each of the other defendants.

49.    All Defendants, and each of them, were fully informed of the actions of their agents and employees, and no officer, director, or managing agent of defendants repudiated those actions, which failure to repudiate constituted adoption and approval of said actions and then all defendants, and each of them, thereby ratified those actions.

50.    Prior to September 11, 2001, the aviation industry defendants knew of the grave risk of attacks upon civil aviation generally, and commercial aircraft and airports.    The Department of Transportation Inspector General, Federal Aviation Administration, Government Accounting Office and other independent and industry auditors repeatedly published information concerning terrorist threats to civil aviation.    For example, in its 1999 annual report, *Criminal Acts Against Civil Aviation* (hereinafter "The 1999 Report"), the FAA's Office of Civil Aviation Security advised of potential dangers, including the identification of Osama Bin Laden as a specific threat to hijack an airliner and target the United States:

> "Another threat to civil aviation is from Saudi terrorist financier Usama Bin Laden....In a May, 1998 interview, Bin Ladin implied that he could use a shoulder-fired surface-to-air missile to shoot down a military passenger aircraft transporting U.S. military personnel.    He reiterated that his attacks would not distinguish between U.S. civilians and military personnel.    Moreover, an exiled Islamic leader in the United Kingdom proclaimed in August 1998 that Bin Ladin would 'bring down an airliner, or hijack an airliner to humiliate the United States."

The 1999 Report at 59.

14

51.    The report also points to the 1994 Ramzi Yousef conspiracy to place explosive devices on as many as 12 U.S. airliners flying out of the Far East as further evidence of the desire and intent to attack U.S. commercial aircraft. *Id.*

52.    In addition, threats that aircraft would be used as missiles and crashed into American institutions were passed on to the FAA and American, the Other Airline Defendants, and other commercial carriers:

> In January 1995, a Philippine National Police raid turned up materials in a Manilla apartment indicating that three individuals – Ramzi Yousef, Abdul Murad and Khalid Shaykh Mohammed – planned, among other things, to crash an airplane into CIA headquarters....Information on the threat was passed to the FAA, which briefed U.S. and major foreign carriers.

Joint Inquiry Staff Statement, Part I, Eleanor Hill, Staff director, Joint Inquiry Staff, September 18, 2002, at p. 26.

In the 1999 Report, the FAA issued the following warning:

> "There is every reason to believe that civil aviation will continue to be an attractive target for terrorist groups...Increased awareness and vigilance are necessary to deter future incidents – be they from terrorists like Ramzi Yousef or non-terrorists bent on suicide, as occurred in Brazil in 1997. It is important to do the utmost to prevent such acts rather than to lower security measures by interpreting the statistics [which showed a decrease in incidents between 1993 and 1998] as an indication of a decreased threat."

The 1999 Report at p. 59-60.

53.    Prior to September 11, 2001, the defendants knew or should have known about numerous documented and reported security breaches involving unauthorized access to secure areas (including ramps and aircraft) and warnings that security was at risk and that passenger and carry-on baggage screening system was vulnerable; those reports detailed dangerous, long-standing flaws and deficiencies in airport security and warned the defendants that their airline and airport security systems were unsafe and needed significant improvements in staffing,

training and equipment in order to ensure the safety of persons traveling in air transportation and persons on the ground or in buildings who might suffer injury or death as a result of improper or unauthorized operation of an aircraft by persons engaged in acts of criminal violence, hijacking, terrorist activity, and air piracy.

54.    On and prior to September 11, 2001, American, the other Airline Defendants knew or should have known that evaluations of the airline and airport security systems as they existed on September 11, 2001 revealed that said systems constituted a grave security risk; that the Security Company Defendants provided screening services which were inadequate and that such inadequacies posed severe dangers to its passengers and the public; that the Security Company Defendants failed to adequately train its employees, hired illegal aliens, failed to conduct required criminal background checks, and routinely failed in undercover security evaluations.

55.    Airline Defendants knew or should have known that the Security Company Defendants failed to adequately train its employees, hired illegal aliens, failed to conduct required criminal background checks, and routinely failed in undercover security evaluations to detect even the most obvious of dangerous and deadly weapons capable of causing injury or death.

56.    As a direct and proximate result of the conduct of all defendants, the defendants are jointly and severally liable for damages sustained by each Plaintiff and each Plaintiff is entitled to recover such damages to the extent allowed under applicable state law.

## COUNT ONE

### (Negligence of American Airlines)

16

57.    Plaintiffs incorporate by reference all prior allegations.

58.    At all times pertinent to this Complaint, it was the duty of American, by and through its officers, agents, employees or designees, to exercise the highest degree of care in the operation, control maintenance and supervision of the subject airport and aircraft for the safety and security of their passengers and of the general public on the ground.

59.    At all times pertinent to this Complaint, it was the duty of American, as the owner and operator of the aircraft, to ensure that aircraft was secure.  In providing passenger screening and the security system for air transportation common carriers at Dulles Airport, it owed a duty to the public to act with the utmost degree of care in the operation, control, maintenance and supervision of its aircraft, the passenger screening processes and security systems.

60.    The failure of American to adequately perform its duties, in providing security services and a reasonably secure aircraft constitute a breach of its duties.

61.    The hijacking and subsequent crash of the subject aircraft was a direct and proximate result of American's breach of duty, negligence, gross negligence, carelessness and recklessness in the ownership, operation, management, supervision, and maintenance of the subject aircraft, the passenger screening processes and security systems at Dulles Airport.  The personal injuries of the Plaintiffs were proximately caused by the negligence of American.

62.    As a result of the foregoing, Plaintiffs suffered severe physical injury, emotional trauma, including fear of impending death, loss of future income and support, loss of services and consortium, and are entitled to damages in an amount to be determined at trial.

## COUNT TWO

### (Negligence of Airline Defendants)

63.    Plaintiffs incorporate by reference all prior allegations.

64.    At all times relevant to this Complaint, each of the Airline Defendants were common carriers which operated commercial airlines transporting passengers and crew members from Dulles Airport.

65.    Each of the Airline Defendants has an independent and non-delegable duty to maintain the security of its aircraft.  In furtherance of this duty, the Airline Defendants acted together and in concert in contracting with Argenbright and/or the security company defendants to provide security services for all flights departing from Dulles Airport.

66.    The Airline Defendants each had a duty, or voluntarily undertook a duty, to exercise the highest degree of care for the safety and security of all passengers and crew members passing through security at Dulles Airport.

67.    The Airline Defendants each knew or should have known that the security screening system it supervised, maintained and controlled through Argenbright/Securicor was grossly inadequate and posed a severe danger to its passengers, crew members and to the public. The Airline Defendants knew or should have known that the security systems in place were a facade and a sieve, frequently unable to detect even the most obvious of dangerous weapons in numerous undercover evaluations.

68.    The Airline Defendants knew or should have known that its agents and security subcontractors, including Argenbright, provided screening services which were grossly inadequate and that such inadequacies posed severe dangers to the public including the Plaintiff.

69.    The Airline Defendants' failure to remedy recognized and repeated security lapses was a reckless, careless and negligent breach of their respective duties of care to all passengers, crew members, the public, and the Plaintiff.

70.    As a direct and proximate result of the Airline Defendants' breach of their duty of care in failing to provide adequate security and safety systems, the hijackers were allowed to board American Flight 77.  The Airline Defendants breach of their duties was a proximate cause of the injuries and death of Leslie Whittington.

71.    As a result of the foregoing, Plaintiffs have suffered severe physical personal injury, emotional trauma, including fear of impending death, pain and suffering, loss of enjoyment of life, loss of future income and support, and is entitled to damages in an amount to be determined at trial.

72.    The Plaintiffs have suffered and will continue to suffer loss of consortium, services, mental anguish, pain and suffering and hedonic damages.

### COUNT THREE

### (Treaty Liability Against Defendant American Airlines, Inc.)

73.    Plaintiff incorporates by reference all prior allegations of this Complaint.

74.    At all times pertinent, the involved flight was under the operation, control, direction, and instruction of defendant American Airlines, Inc., its officers, agents, servants, and/or employees.

75.    The events alleged herein which occurred in the air during American Airlines Flight 77 on September 11, 2201, constituted an accident or unexpected unusual event external to decedents under the applicable provisions of the Warsaw Convention.

76.    At all times pertinent, before September 11, 2001, defendant American signed and incorporated into their tariffs the International Air Transport Association (IATA) Intercarrier Agreement on Passenger Liability modifying the terms of the Warsaw Convention to assume

unlimited liability for passenger injury caused by an accident or unexpected unusual event within the meaning of Article 17.

77.     Said Intercarrier Agreement was intended, among other things, to be for the benefit of plaintiffs' decedents as members of the traveling public and to induce the patronage of plaintiffs' decedents.

78.     American's employees failed to take all necessary measures to avoid the crash, which was avoidable.   Therefore, Article 20(1) of the Warsaw Convention does not apply. Pursuant to Article 17 of the Warsaw Convention, defendant American Airlines is liable for the wrongful death of Leslie Whittington and for survival damages to plaintiff.

79.     The limitations on recoverable damages contained in Article 22 of the Warsaw Convention do not apply for one or more of the following reasons: (1) due to the IATA Intercarrier Agreement, previously alleged herein, and/or (2) because defendant American, by and through their officers, agents, servants, and/or employees, were guilty of willful misconduct within the meaning of Article 25 of the Warsaw Convention.

80.     As a direct and proximate result of the foregoing, plaintiff and plaintiff's decedents' beneficiaries, survivors, and heirs, are entitled to recover the damages alleged herein, and defendants are liable to plaintiffs for compensatory damages in a sum within the jurisdiction of this court.

81.     The events in the air and crash of American Airlines Flight 77 were caused by the wanton and willful misconduct of defendant American, including their officers, agents, servants, and/or employees as alleged herein, whose conduct was conscious, callous indifference and disregard for the rights and safety of plaintiff's decedents and was despicable conduct.

82.   As a direct and proximate result of the conduct of defendant American, it is liable to plaintiff for punitive damages, in a sum within the jurisdiction of this court.

## COUNT FOUR

### (Negligence of Security Company Defendants)

83.   Plaintiffs incorporate by reference all prior allegations.

84.   At all times relevant to this Complaint, Argenbright/Securicor owned, operated and controlled, through its employees and agents, the security and passenger screening system in place at Dulles Airport on September 11, 2001.

85.   Argenbright/Securicor owed all passengers and the general public a duty of care in preventing terrorists from carrying dangerous weapons through its security system and services.

86.   Argenbright/Securicor recklessly and negligently breached its duty of care by failing to adequately train its employees, hire qualified personnel, or correct known security lapses.  Argenbright ultimately failed to prevent five young male middle Eastern terrorists from passing through the security system at Dulles Airport on September 11, 2001, transporting deadly and dangerous weapons.

87.   At all times pertinent to this Complaint, Argenbright/Securicor knew or should have known that its security screening program and personnel were grossly inadequate. Argenbright/Securicor routinely failed to detect dangerous weapons in undercover investigations and was repeatedly found to be remiss in carrying out its duties and the duties of the aviation

21

industry. Argenbright knew or should have known that such inadequacies posed severe dangers to airline passengers and the general public.

88.     As a direct and proximate result of Argenbright's breach of its duty of care, five terrorists were permitted to board and hijack Flight 77, thereby causing the crash of the aircraft and the injuries and death of Plaintiff.

89.     As a result of the foregoing, Plaintiffs suffered severe physical personal injury, emotional trauma, including fear of impending death, loss of future income and support, loss of services and consortium, and are entitled to damages in an amount to be determined at trial.

90.     As a direct and proximate result of the conduct of all defendants, the defendants are jointly and severally liable for damages sustained by each Plaintiff and each Plaintiff is entitled to recover such damages to the extent allowed under applicable state law.

## COUNT FIVE

### (Negligence of Airport Defendant)

91.     Plaintiffs incorporate by reference all prior allegations.

92.     At all times relevant to this Complaint, the Airport Defendant owned, operated and controlled, through their employees and agents, the security and passenger screening systems in place at Logan Airport on September 11, 2001.

93.     Airport Defendant owed all passengers, crew members and the general public the highest duty of care in preventing passengers from carrying dangerous weapons through its security systems and services.

94.     Airport Defendant recklessly and negligently breached its duty of care by failing to adequately train its employees, hire qualified personnel, or correct known security lapses. Airport Defendant ultimately failed to prevent young, male, Middle Eastern Islamic terrorists

22

from passing through their security systems at Logan Airport on September 11, 2001, transporting dangerous, deadly, and prohibited weapons.

95.    At all times pertinent to this Complaint, Airport Defendant knew or should have known that security screening programs and personnel in place were grossly inadequate.  The Airport Defendant knew or should have known that these gross inadequacies posed severe foreseeable danger and risk to airline passengers, crew members and the general public, including Leslie Whittington.

96.    As a direct and proximate result of Airport Defendant's breach of its duty of care, terrorists were permitted to board United Flight 175, and to board, hijack and terrorize United Flight 175, thereby causing the crash of the aircraft and the injuries and death of Leslie Whittington.

97.    As a result of the foregoing, Leslie Whittington suffered severe physical personal injury, emotional trauma, including fear of impending death and wrongful death, and his estate is entitled to damages in an amount to be determined at trial.

98.    The Plaintiffs have suffered and will continue to suffer mental anguish, grief and loss, loss of income and support, loss of services, companionship and care, and are entitled to damages.

## COUNT SIX

### (Strict Liability of Boeing)

99.    Plaintiffs incorporate by reference all prior allegations in this Complaint.

100.    The aforementioned aircraft was being used in an intended and foreseeable manner on the morning of September 11, 2001.

23

101.    Defendant Boeing defectively designed the cockpit or flight deck environment, including its door and accompanying locks of the subject aircraft.  The design in use on September 11, 2001, in the subject aircraft was unreasonably dangerous in that it could easily be penetrated by a determined passenger.  The cockpit door was not secure and the accompanying locks were insufficient to deter or prevent unauthorized or unlawful entry to thwart a hijacking attack.  Alternative and safer designs were available for a nominal increase in cost which would have prevented these terrorists from gaining access to the cockpit on American Flight 77.

102.    This defective design permitted the terrorists to gain access to the cockpit of American Flight 77 and hijack the aircraft.  Boeing's defective design was a proximate cause of the deaths of each Plaintiff's decedent.

103.    As a direct and proximate result of the conduct of all defendants, the defendants are jointly and severally liable for damages sustained by each Plaintiff and each Plaintiff is entitled to recover such damages to the extent allowed under applicable state law.

104.    As the result of the violent impact and crash of the Flight 77 into the Pentagon on September 11, 2001, Plaintiffs herein suffered serious bodily harm and injury, fear of impending death, death, loss of consortium and services that continue to manifest to the entire family.

## COUNT SEVEN

### (Negligence of Boeing)

105.    Plaintiffs incorporate by reference all prior allegations.

106.    Defendant Boeing designed and manufactured the 757 aircraft, tail number N644AA, operated on September 11, 2001 as American Flight 77, and similar aircraft.

107.    Defendant Boeing owed the airlines, their crew members, the passengers, and the public, a duty of care in safely designing aircraft, including the duty of providing safety features including secure cockpit doors and locks.

108.    Defendant Boeing breached its duty of care by failing to design, manufacture, install or provide adequately safe or secure cockpit doors and locks on aircraft, including the 757 aircraft, in a manner which would prevent hijackers and/or other dangerous passengers from easily accessing the cockpit and pilots.    The cockpit doors on American Flight 77 did not adequately protect the pilots or the crew.    In addition, they were not secure, and the only locks available were insufficient to deter or prevent access and a hijacking attack.

109.    Defendant Boeing knew or should have known of the risk of hijacking and air piracy and that the design of this cockpit door was inadequate.    Defendant Boeing's failure to remedy this defect was a breach of its duty of care.    Defendant Boeing knew or should have known that alternative, secure and safer designs were available which would have prevented cockpit access.

110.    Boeing's breach of its duty of care in the design and manufacture of the 757 was in deliberate and reckless disregard for safety and security and permitted the terrorists to easily gain access to the Flight 77 cockpit on September 11, 2001, and was a proximate cause of the death of Leslie Whittington.

111.    As a result of this negligence, Leslie Whittington suffered severe physical personal injury, emotional trauma, including fear of impending death, death, pain and suffering, loss of enjoyment of life, loss of future income and support, and Plaintiffs are entitled to damages in an amount to be determined at trial.

112.    The Plaintiffs have suffered and will continue to suffer loss of consortium, services, loss of future income, mental anguish, and hedonic damages.

## COUNT EIGHT

### (Breach of Warranty by Boeing)

113.    Plaintiffs incorporate by reference all prior allegations.

114.    A usual and customary component of Defendant Boeing's business is the design and manufacture of commercial aircraft to be used by common carriers to transport passengers.

115.    Defendant Boeing designed, manufactured and placed into the stream of commerce the 757-223 aircraft, tail number N644AA, which operated on September 11, 2001, as American Flight 77.

116.    In placing the aforementioned aircraft into the stream of commerce, Boeing warranted that the aircraft was reasonably safe for its intended use as a commercial aircraft to be used for transporting passengers.

117.    The aforementioned aircraft was being used in an intended and foreseeable manner on the morning of September 11, 2001.

118.    Defendant Boeing defectively designed the door and accompanying locks to the cockpit of the 757 aircraft. The design in use on September 11, 2001, of the aircraft in question, was unreasonably dangerous in that it could easily be penetrated by any determined passenger. The cockpit doors were not secure and the accompanying locks were insufficient to deter or prevent a hijacking attack. Alternative and safer designs were available for a nominal increase in cost which would have prevented the ability to access the cockpit of American Flight 77.

119.    This defective design permitted ready access to the cockpit. Boeing's defective design and failure to design and provide secure cockpit doors was a proximate cause of the injuries and death of the Plaintiff.

120.    Because of the defective design of the cockpit door, the 757 aircraft, tail number N644AA was not reasonably safe for its intended use as a commercial passenger aircraft when it was placed by Boeing in the stream of commerce. Boeing breached its warranty by placing into the stream of commerce an aircraft that was not reasonably safe for its intended use.

121.    Because ground victims are foreseeable victims of airplane crashes, Plaintiffs were among those whom Boeing might reasonably have expected to be affected by the plane.

122.    As a result of the foregoing, Plaintiffs suffered severe physical personal injury, emotional trauma, including fear of impending death, death, loss of future income and support, loss of services and consortium, and are entitled to damages in an amount to be determined at trial.

## COUNT NINE

### (Wrongful Death)

123.    Plaintiffs incorporate herein by reference all prior allegations.

124.    Plaintiffs bring this action for the wrongful death of Leslie Whittington proximately caused by the Defendants' negligence and strict liability.

125.    Plaintiffs are entitled to recover monetary damages from Defendants for the wrongful death of Leslie Whittington. Plaintiffs are entitled to recover full damages incurred, as fair and just compensation for the injuries, resulting from this wrongful death.

126.    The injuries, trauma, damages, and wrongful death suffered by Plaintiffs were proximately caused by the negligence of the Defendants.

127. As a direct and proximate result of the wrongful death of Leslie Whittington, Plaintiffs have suffered and will continue to suffer emotionally and financially, having been deprived of all future aid, income, assistance, wages, support, services, comfort, companionship, affection and financial support.

128. As a further result of acts of the Defendants, Plaintiffs have incurred actual damages including but not limited to out of pocket expenses, lost wages, lost potential earnings and other expenses and losses for which it is entitled to full and fair recovery.

## COUNT TEN

### (Survival)

129. Plaintiffs incorporate herein all prior allegations.

130. As a result of the reckless, grossly negligent and/or negligent acts of Defendants as described herein, Leslie Whittington was placed in a severe, prolonged, extreme, and traumatic apprehension of harmful, offensive unwarranted bodily contact, injury and assault. Leslie Whittington suffered intensely severe and offensive harmful bodily contact, personal injury and battery; including but not limited to extreme trauma, fear, terror, anxiety, emotional and psychological distress, knowledge of impending death and related physical and emotional trauma and physical pain.

131. Leslie Whittington was mentally, physically and emotionally damaged, harmed, trapped, and falsely imprisoned prior to his personal physical injury and death.

132. As a result of Defendants' negligent conduct, Leslie Whittington endured pain and suffering, severe trauma, fear, anxiety, physical mental and emotional distress and anguish and other items of damages to be shown at trial.

28

133.    The Estate of Leslie Whittington seeks and is entitled to survival damages for the intense pain and suffering, physical, emotional, and psychological trauma inflicted upon her prior to her death.

## COUNT ELEVEN

### (Claim for Wrongful Death and Survival Damages Based on Res Ipsa Loquitur)

134.    Plaintiffs incorporate by reference all prior allegations.

135.    Defendants had exclusive management and control of the aircraft and airport security systems, through with the terrorists penetrated, and whose actions resulted in damages to and death of Leslie Whittington.

136.    The penetration of the aviation security systems and Leslie Whittington's death as set forth herein, are such that would not have occurred had the Defendants exercised reasonable and ordinary care in the maintenance and operation of basic security.

137.    Because of the Defendants' exclusive control and management of aviation security, Defendants are possessed of superior, if not exclusive, access to information concerning the precise cause of the hijackings.  The Defendants were in the position to prevent hijackings, knew full well the risk of hijackings, and failed to act to prevent them.

138.    The penetration of the aviation security system was not due to any action or contribution on the part of Leslie Whittington.

139.    As a result of the foregoing, Leslie Whittington suffered severe physical personal injury, emotional trauma, including fear of impending death and wrongful death, and her heirs are entitled to damages in an amount to be determined at trial.

140.    The Plaintiffs have suffered and will continue to suffer mental anguish, grief and loss, loss of income and support, loss of services, companionship and care, and are entitled to damages.

## COUNT TWELVE

### (Negligent Infliction of Emotional Distress)

141.    Plaintiffs incorporate by reference all prior allegations.

142.    Defendants owe a duty to the public and to the Plaintiffs to adequately safeguard air travel.  Defendants undertook this duty freely.

143.    Defendants knew or should have known that their conduct and actions in failing to implement adequate security systems would lead to increased danger, risk of catastrophic injury, and severe, debilitating emotional distress to its passengers and to those on the ground, and to the Plaintiffs.  The Defendants knew or should have known that the failure to implement adequate safety and security measures placed the public in extreme danger, increasing the risk of injury and the resulting emotional distress.

144.    The conduct and actions of the Defendants were done in breach of their duties and in negligent disregard for the rights and lives of the general public and of those killed and injured at the Pentagon.

145.    The course of conduct undertaken by the aviation industry in failing to safeguard airports and aircraft was such that it was reasonably foreseeable to result in the death, injury and suffering of innocent people, both in the air and on the ground.  The repeated failure to implement adequate security culminated in injury of and damage to Leslie Whittington resulting

in severe, continuing, permanent mental, physical and emotional distress and suffering, and resulting loss of consortium and services to Plaintiffs.

146.    As a direct and proximate cause of Defendants' negligent, grossly negligent and/or reckless misconduct and disregard for public and aviation safety in breach of their duty, Plaintiffs have suffered severe emotional distress and ongoing psychiatric injuries and damages.

147.    Defendants, by reason of their negligent breach of duty and/or recklessness, inflicted emotional distress upon the Plaintiffs.

148.    Demand for Punitive Damages Against all Defendants

149.    Plaintiffs incorporate by reference all prior allegations.

150.    Defendants knew that their conduct and actions would lead to increased danger, risk of injury, and resulting emotional distress to the Plaintiffs.  The Defendants knew that the failure to implement adequate safety and security measures would place passengers and crew in unreasonable danger and subject them to emotional distress.  The failure to act in the face of this risk constitutes reckless, grossly negligence, willful, wanton conduct.

151.    The actions of Defendants were in blatant negligent disregard for the rights and lives of those killed and their surviving loved ones.

152.    The acts, omissions, and conduct of Defendants were undertaken in an outrageous manner.  The course of conduct of the aviation industry was such that it was reasonably foreseeable to result in the death, injury and suffering of innocent people.  The repeated and intentional failure or refusal to implement adequate security culminated in the death and injury of innocent people on September 11, 2001, including Leslie Whittington, causing continuing, permanent, emotional, mental and physical suffering to the Plaintiffs.

153.    As a direct and proximate cause of Defendants' willful, wanton, grossly negligent and/or reckless misconduct and disregard for safety in breach of their duty, Plaintiffs have suffered severe emotional distress, physical and psychiatric injury.

154.    As a result of this negligence, Leslie Whittington suffered severe physical personal injury, emotional trauma, including fear of impending death, pain and suffering, loss of enjoyment of life, loss of future income and support, and she is entitled to damages in an amount to be determined at trial.

155.    The Plaintiffs have suffered and will continue to suffer loss of consortium, services, loss of future income, mental anguish, and hedonic damages.

## JURY DEMAND

156.    Plaintiffs demand a trial by jury of all issues that are so triable.

## REQUEST FOR RELIEF

WHEREFORE, having complained of the conduct of the Defendants, the Plaintiffs pray for relief commensurate with the causes of action set forth herein, including but not limited to an award of actual damages in an amount determined by the trier of fact to be sufficient to compensate fully for all economic losses suffered by the Plaintiffs, pain and suffering, loss of consortium, services and companionship, an award of punitive damages as appropriate, in an amount determined to be sufficient to hold the Defendants accountable for their part in this tragedy, to express the seriousness of their conduct, and to deter such similar conduct in the future, reasonable attorney's fees, the costs of this action, and such additional relief as this Court deems equitable, just and proper.

**HANLY & CONROY LLP**

By: _____

     Paul J. Hanly, Jr., Esquire (PH-5486)
     Jayne Conroy, Esquire (JC-8611)
     415 Madison Avenue
     New York, NY 10017-1111
     Telephone: (212) 401-7600

       and

**MOTLEY RICE LLC**

By: _____

     Michael E. Elsner, Esquire (ME-8337)
     Ronald L. Motley, Esquire
     Don Migliori, Esquire
     Jodi Westbrook Flowers, Esquire
     Mary Schiavo, Esquire
     Jeff Thompson, Esquire
     Robert T. Haefele, Esquire
     Justin B. Kaplan, Esquire
     Motley Rice LLC
     28 Bridgeside Boulevard
     Post Office Box 1792
     Mount Pleasant, SC 29465
     Telephone:  (843) 216-9000

Dated:  New York, New York
March 31, 2004

# EXHIBIT B

03/17/2006 15:27 FAX 212 805 7942        JUDGE ALVIN HELLERSTEIN                    ☑003/004

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

IN RE SEPTEMBER 11 LITIGATION

-----------------------------------------------------------x

**ORDER DENYING
DISCOVERY REQUESTS**

21 MC 97 (AKH)
21 MC 101 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

       Plaintiffs in the above captioned actions request additional discovery relating to alleged improprieties on the part of the Transportation Security Administration ("TSA") and certain of the defense lawyers in the instant litigation. Specifically, Plaintiffs assert that documents recently made available in the matter of U.S. v. Moussaoui, currently pending before Judge Leonie Brinkema in the Eastern District of Virginia, indicate an improper relationship between the TSA and defense counsel. Plaintiffs request a conference to address these concerns and further request permission to take depositions of various government officials. For the reasons stated below, Plaintiffs' request is denied.

       By their letters, Plaintiffs assert that the communications between the TSA and certain of the defense lawyers in the instant litigation indicate that the TSA may not have acted with impartiality in reaching its determinations as to matters affecting both the In re September 11 Litigation and the Moussaoui death penalty trial currently pending before Judge Brinkema. To the extent any alleged improprieties by the TSA and defense counsel concern the case currently before Judge Brinkema, such concerns are beyond the scope of my jurisdiction. To the extent any alleged improprieties raise questions as to the validity of the Final Order issued by the TSA on February 7, 2006 in In re September 11 Litigation, such concerns should properly be brought to the Second Circuit Court of

Appeals which holds exclusive jurisdiction over appeals from final orders by the TSA. See 49 U.S.C. § 46110.

In accordance with the foregoing, the request by Plaintiffs is denied, as not properly within the scope of cases and controversies over which I preside. Accordingly, and by separate enclosures, I am returning to their sender all letters submitted by counsel on this subject. Any requests by the media or members of the public for access to the letters referenced in this Order should be directed to Judge Brinkema.

SO ORDERED.

Dated:      New York, New York
            March 17, 2006

ALVIN K. HELLERSTEIN
United States District Judge

2